# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0030-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.P.,

     Defendant,

and

D.S.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.J.P.,
a minor.

_____

     Submitted April 10, 2024 – Decided April 19, 2024

     Before Judges Firko and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0011-23.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Louis W. Skinner, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Nicholas Joseph Dolinsky, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant D.S. (David)[1] appeals from a judgment of guardianship terminating his parental rights to his biological son L.J.P. (Luke), born in 2016.[2] Defendant M.P. (Mary), Luke's biological mother, surrendered her parental

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because records relating to Division proceedings held pursuant to Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

[2] David also has another daughter who lives with her mother and is not part of this appeal.

rights to Luke, and is not a party to this appeal.[3]  Judge Michael Paul Wright convened the guardianship trial and rendered an oral opinion.  David argues the Division of Child Protection and Permanency (Division) failed to establish by clear and convincing evidence the statutory four-prong best interests test under N.J.S.A. 30:4C-15.1(a).  David contends the judge erred in failing to correctly consider and apply the July 2, 2021 statutory amendments to the Kinship Legal Guardianship (KLG) Act[4] and avers the judge disregarded the Legislature's intent by giving weight to the resource parents' wishes to adopt and not protecting his parental rights.  David also asserts the judge erred by not exploring KLG as an alternative to termination of his parental rights.

The Law Guardian seeks affirmance.  We conclude, after reviewing the record in light of David's arguments, that the judge correctly applied the governing legal principles, and sufficient credible evidence supports the judge's findings.  Therefore, we affirm.

I.

---

[3]  Mary has another daughter named "Ida," whose father is "Andy."  Ida is not part of this appeal.

[4]  On July 2, 2021, the Legislature enacted L. 2021, c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2), which read "[s]uch harm may include evidence that separating the child from [their] resource family parents would cause serious and enduring emotional or psychological harm to the child."

A-0030-23

We begin our discussion with the legal framework governing the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature established the standard for determining when parental rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and

A-0030-23

(4) Termination of parental rights will not do more harm than good.

The four prongs are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved [in determinations of parental fitness] are extremely fact sensitive and require particularized evidence that address[es] the specific circumstance[s] in the given case." R.G., 217 N.J. at 554 (internal quotation marks omitted) (second alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280 (2007)).

## II.

### A. Family History

The pertinent facts and procedural history are fully recounted in Judge Wright's comprehensive oral opinion and need only be summarized. The Division first became involved with the family in early 2017 because of allegations of drug use and domestic violence. The Division found no abuse or neglect and closed its investigation. David's history includes criminality, mental health problems, homelessness, and dysfunction. He was in the foster care

5

system in Russia and came to the United States when he was adopted at the age of six.

The record shows David was abused as a child by his caretakers in Russia—putting cigarettes out on him and breaking his bones. David pled guilty and was convicted of two counts of child endangerment.[5] He is a Megan's Law registrant and part of his sentence included Parole Supervision for Life. The record shows David violated certain terms of his parole and Megan's Law restrictions. Mary has a history of homelessness, substance abuse, and mental health problems.

On December 11, 2017, the police reported that Mary and Luke were at the police station after she stabbed her boyfriend in what she described as "self-defense" during a domestic violence incident. Mary was arrested and charged with aggravated assault and weapons charges. At the same time, David was incarcerated for the stated sexual assault charges. With both parents in jail, the Division executed an emergent removal[6] of then one-year-old Luke and placed

---

[5] According to David, he went to a party and met two girls who informed him that they were eighteen years old. He then engaged in sexual relations with them.

[6] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at

him with Greta and Brian, non-relative resource parents.[7] The judge granted the Division's request for the care, supervision, and custody of Luke.

David was granted weekly supervised visitation with Luke while he was incarcerated, which continued on a monthly basis, until October 2018. Mary engaged in treatment for her issues and was reunified with Luke in November 2018. David was still incarcerated at that time. The judge ordered that David's visitation with Luke was subject to Mary's discretion, which she opted not to continue.

In August 2021, the police called the Division with concerns for Luke and Ida, his younger half-sister, after Mary called multiple times reporting that someone was at the door. When the police responded, they found no one but observed Mary was delusional and malnourished. Mary, Luke, and Ida were taken to the hospital. Hospital staff members reported to the Division that Luke was "eating everything put in front of him," had a "red and pink burn mark on his left hand," and Ida was "very thin" and "pale" and had a healing rib fracture.

---

N.J.S.A. 9:6-8.21 to -8.82. The Dodd Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

[7] David requested that his adopted parents be assessed as a placement option, but they declined.

A-0030-23

The Division conducted a Dodd removal of both children. David was still incarcerated at the time. The Division placed Luke with Robert, his maternal grandfather. In September 2021, David was released from prison. However, he was noncompliant with his terms of parole and failed to appear for a court-ordered substance abuse evaluation or rescheduled appointments. The judge ordered that David's visitation with Luke was deferred "until clinically indicated to commence" because of David's lack of contact and relationship with the child since 2018. David was placed on "missing status" by the Division and remained incommunicado for the remainder of 2021 and early 2022. Based on a tip from Mary, the Division ultimately located David in a Trenton prison on July 13, 2022.

By July 2022, Robert indicated he could not keep the children past November 2022. The Division transitioned Luke and Ida back to Greta's and Brian's home, where they remain to this day. In November 2022, Dr. Jessica Elliot conducted a psychological evaluation of David at the prison, which included an assessment of the appropriateness of visitation.[8] Dr. Elliot noted in

---

[8] Dr. Elliot reviewed the Division's Court Report dated November 9, 2022, and the evaluation included a clinical interview, mental status examination, personality assessment inventory, and adult adolescent parenting inventory.

A-0030-23

her report that David was "polite, cooperative, and engaged throughout the evaluation," and he was incarcerated for violating his parole.

David reported his criminal history to Dr. Elliot and his diagnoses of "[b]ipolar, depression, anxiety, ADHD (Attention Deficit Hyperactivity Disorder)," and substance abuse. Dr. Elliot opined that reunification was possible if David engaged in treatment services and maintained sobriety, housing, and employment. Upon receipt of Dr. Elliot's report, the Division realized she did not have all the information about David's criminal history, and the Division provided the information to her.

After receiving additional information from the Division, Dr. Elliot prepared an addendum to her report, explaining David did not address the extent of his two sexual assaults upon minors during the initial evaluation. Dr. Elliot opined "this new information substantially changes the formulation of [David's] risk and warrants a more thorough and specialized risk assessment prior to the commencement of visitation."

On December 7, 2022, the Division filed a complaint for guardianship. After being served with the complaint while incarcerated, David expressed his wishes for reunification with Luke. The Division discussed David's plan for post-release housing, employment, and services. At the February 2, 2023 return

9

date for the hearing on the order to show cause, the Law Guardian asked the judge to consider restricting visitation until an updated evaluation of David was performed. On March 20, 2023, the judge ordered Dr. Barry Katz to conduct a psychosexual evaluation of David at the prison.

On March 28, 2023, Dr. Katz conducted the following during the evaluation: a forensic interview; record review; mental status exam; assessment of parenting skills; the Adult, Adolescent Parenting Inventory, Second Edition (AAPI-2.1); the Personality Assessment Inventory (PAI); and Sexual Violence Risk-20, Version 2 (SVR-20-V2).

Dr. Katz observed that David had been incarcerated for most of Luke's life and had not seen him in years. When discussing his sexual offense charges, David reported to Dr. Katz that he did not agree with the charges and that he was not "going to sit in class like parole wants and talk about why he is not going to have sex with kids." David felt both charges were completely false "because [he] would not go out with them and [he] called them ugly to their face and a week later [he] got a call from police saying we need to speak to you on this." David declined to report anything further about his criminal history because he "did not trust the system."

David informed Dr. Katz that he was not taking his medication because he needed to "get the monkey off [his] back." Although David denied any suicidal

10

A-0030-23

ideations, he reported that "he had thoughts about hurting others, but that he would not do it." David acknowledged that his depression "has led to lack of motivation and lack of caring." When further discussing his drug usage, David said he used marijuana daily, including illegally in jail, denied ever using opiates, but was prescribed Suboxone at the prison because he claimed, "why not."

David also stated he had been hospitalized twice for mental health issues and had been prescribed psychiatric medication. He attended counseling in prison but was discharged due to "budget cuts." David previously underwent counseling for depression and anxiety. He never completed sex offender therapy and claimed that he never would.

Dr. Katz noted in his report that David presented as paranoid and inconsistent in his reporting. He also found David "displayed extensive denial [and] minimalization with regard to his sexual offending behavior, including blaming the victims and assert[ing] that his prior admission and conviction was incorrect." Regarding his future plans, Dr. Katz found David was "not realistic based upon his pattern of continued antisocial acts, substance abuse and instability." Dr. Katz opined there was a "high risk to a child placed in [David]'s care or supervision unsupervised" and a "risk of exploitation of minors in his care or supervision and pathological hatred of women." He also noted that since David "has a general

11

understanding of accepted parenting practices, . . . his deficits as a parent are not due to a lack of education but rather are an extension of [David] putting his needs before anyone else's, including his children."

Based upon the above findings, Dr. Katz ultimately concluded:

> [David] should not have contact with [Luke] due to the risks involved. The risks to the child would be present during supervised visitation, albeit much higher if visitation were unsupervised. In response to the goal of [David] eventually being a viable placement for [Luke], the results of this evaluation indicate that [David] would not be able to be a viable caretaker for [Luke] at this time or in the foreseeable future. With regard to the issue of supervised visitation, it is not recommended for [David] to have contact with [Luke] at this time or in the foreseeable future.

Dr. Katz also found that David presented a low to moderate risk of direct sexual harm to Luke, but posed a high risk of impulse control problems, including anger and exposure to inappropriate sexual stimuli and concluded that the harm could not be mitigated even under supervision. Dr. Katz did not consider reunification as a viable option within the foreseeable future.

On April 19, 2023, Dr. Gregory Gambone conducted a psychological evaluation of David on behalf of the defense. Dr. Gambone found that David exhibited "thought and behavior patterns that may affect his decision making, his ability to control substance abuse, his ability to maintain an independent pro-

social life, and his ability to benefit from psychotherapy." With regard to his ability to parent, Dr. Gambone opined that "when stable, substance-free, conflict-free, crime-free, symptom-free, and stress-free, [David] may exhibit adequate executive functioning in learning, problem solving, contingency planning, and social decision-making."

Dr. Gambone's report also noted that David has "a superficial understanding of the physical, emotional, intellectual, and social needs of his son" and has a reported history of "disregarding his responsibility for his children's health, safety, and stability." Based upon the above findings, Dr. Gambone recommended that David engage in various services, including therapy, parenting skills training, and sex offender treatment. Dr. Gambone concluded:

> [David] should not currently be considered to present an imminent risk of impulsive harm to himself, his son [Luke], or any other person. However, it is also recommended that [David] should not currently be considered capable of adequately parenting any children on an independent basis. Areas of continued concern include [David]'s current incarceration, his subsequent societal re-entry stressors, and his lack of regular or consistent contact with his son [Luke] in the past [four] years. Accordingly, it is recommended that [David] be currently considered appropriate for supervised contact with his son [Luke] during his incarceration and subsequent release, contingent on documented compliance with all court-ordered services

and Megan's Law supervision. As a means of maximizing his personal stability, interpersonal stability, parenting skills, and coping skills, [David] is strongly encouraged to comply with all of the aforementioned recommendations.

## B. The Guardianship Trial

The judge held a three-day trial. Caseworker Ashley Markferding and Dr. Katz testified on behalf of the Division. Dr. Gambone testified on behalf of David.

Markferding testified about the Division's efforts to explore Luke's placement with relatives. Robert was ruled out because he had asked for Luke to be removed from his home. Robert's mother, who lived in the Dominican Republic, was ruled out because neither Mary nor David wanted the children placed out of the country. Mary's aunt was ruled out based on an Interstate Compact of the Placement of Children's denial from New York due to her failure to provide the requisite documentation. David's adoptive parents declined to be placement resources. Mary's uncle declined to be considered due to housing issues, and Ida's mother refused to get involved in a case involving David.

Markferding stated that Luke is a "loving boy, it makes you smile," he's "affectionate," and "loves his [half-]sister." Markferding observed that Luke "remembered [Greta] and . . . loved being in [her] care. And even currently she

14

had lots of kiddos that he thoroughly enjoys playing with and being around." Markferding testified that she explained the difference between KLG and adoption to Greta, and she preferred adoption over KLG but would be open to facilitating a relationship between Luke and David even if she adopted Luke. According to Markferding, Luke did not recall visiting David at a "locked facility." When Markferding asked Luke if he knew who his "biological father" was, he named the resource father. Markferding testified that she asked Luke if he knew an individual named "David," and he responded "no."

Dr. Katz was qualified as an expert in psychology, parental fitness, forensic psychology, and sex offenders. When asked about David's childhood trauma and its impact, if any, on the case, Dr. Katz responded, "traumatized people traumatize people." Dr. Katz noted that David fell into a group referred to as the "antisocial or psychopathic sex offender," and for those people, "all individuals are viewed as fair game. And what will happen is that if they're able to commit a crime or offense against an individual they're entitled to do it and it's the person's fault for being in a vulnerable position by the offender's view." Dr. Katz opined that "if they're vulnerable and [David's] able to take advantage of them then he will." Dr. Katz stated that David's parole violations also speak

15

A-0030-23

to antisocial psychopathic behavior, because he was willing to risk further incarceration even though he knew he was being monitored.

Dr. Katz also noted that David was an inconsistent reporter. He testified that "at one point [David] says he has an addiction to opiates and at another point he says he's never used opiates except for a short time, and he has no addiction to it." And when asked why he was taking Suboxone for treatment if he really was not addicted, David responded, "for the hell of it, for the thrill of it." Dr. Katz opined these inconsistent statements stem from the fact that "[David] presents whatever information he feels is going to help him or blurts out at that moment because it's going to be something exciting or thrilling or enthralling," and "that [David] is committed to continuing this antisocial lifestyle, committing additional offenses . . . and plays into very much this attention seeking/thrill seeking behavior where he's going to exploit anyone he wishes as part of that process."

Dr. Katz also found that David's lack of contact with the Division during the time he wasn't incarcerated was significant and demonstrated the antisocial psychopathic dynamic as "the focus of the individual is themselves, not on others, not of meeting others needs just their own needs." Dr. Katz further noted that individuals with antisocial psychopathic have a very poor history of

16

compliance, and "even if they do comply, they don't benefit from therapy, because their goal is to again meet their own needs and to get the therapy to meet their needs there."

Dr. Katz also went on to discuss David's potential empathy for Luke. The test results administered indicated that David understands "what's expected of a parent in terms of how to be empathic. He chooses not to. And the indication is he's not going to." Dr. Katz reasoned:

> Because first of all he doesn't describe empathy towards multiple individuals. The victims of his sexual offenses he—on empathy towards. In fact he says demeaning things about those victims. Saying that they're—that he just thought that they were ugly and that they were— you know, liars and et cetera. And so there's a total lack of empathy even for those that he's victimized in these very serious ways. And towards other victims, again with domestic violence et cetera, lack of empathy towards anyone expressed as a willful intent not as a lack of understanding.

Dr. Katz also found David's lack of a relationship with his older child to be significant and "a general parenting deficit." He explained that its "a part of [a] pattern of—about meeting the needs of another child that he has and abandoning that child, in the same similar pattern as we have with [Luke]," showing the chronicity of the behavior across situations. Dr. Katz also found that David's mistrust in the system and his belief that Luke was going to be

17

adopted no matter what stemmed from the fact that he "at one level clearly understands he's not complied, he's not had any contact with child. He has another child he's not seen. He's engaged in criminal behavior. He's repeatedly incarcerated in state prison, and that his case looks, you know, very poor."

Overall, Dr. Katz testified that David's risk to Luke "in terms of specific sexual offending" is "low to moderate," and found:

> His impulsiveness, his seeking behaviors, lack of empathy, his lack of care, his lack of responsiveness to [Luke]'s needs at any point in the history of the case, speaks—well combined with the psychopathic antisocial acting out behaviors shows any child, especially a young vulnerable child, would be at risk for a multitude of types of neglect, abuse, et cetera in [David]'s care or presence. And that these dynamics can occur even under supervision - even therapeutic supervision.

Dr. Katz opined that David harmed and posed a risk of harm to Luke, "in the form of abuse or neglect." And, Dr. Katz stated that therapy would not improve the situation due to David's "lack of compliance with services" and his unwillingness to engage in means to alleviate the harm. Dr. Katz criticized Dr. Gambone's conclusions because he did not perform any sex offender assessment on David and that he used the "Mini Mental State Examination," which is "very limited" and "not a comprehensive psychological personality test that would

18

cover things like validity, patterns of behavior, et cetera."[9]  Dr. Katz disagreed with Dr. Gambone's recommendation that David engage in therapeutic visitation with Luke because his behavior would "likely be impulsive, irreverent, harmful, [and] emotionally harmful to Luke."  Dr. Katz concluded that maintaining a parental relationship between David and Luke was not in the child's best interest.

Dr. Gambone testified on behalf of David as an expert in forensic psychology, parental fitness, and psychology as it related to sexual offenses and harm to children.  Dr. Gambone described David as "a person who just does not like authority, does not like to be told what to do, does not like to be monitored." Regarding a parenting plan for Luke, Dr. Gambone testified:

> the biggest issue with [David] and the concept of parenting is he's kind of saying, you know if I get my kid back I'd like to give it a try.  If I don't get my kid back I'm not sure I want to give it a try.  You know, and again, that's the antisocial.  Again that's the . . . manipulation.

Dr. Gambone added that "[David] has provided neither primary nor supportive care for his son [Luke] for more than four years. He has had only minimal contact with his son during the same time."

---

[9]  Dr. Gambone attempted to administer a more comprehensive assessment known as the Minnesota Multiphasic Personality Inventory 2, but David refused to take it.

Dr. Gambone recommended a medication review, discontinuing Suboxone treatment, parenting skills classes, short-term individual therapy, sex offender specific treatment, and therapeutic visitation with Luke. Dr. Gambone stated, "with [David] I kind of think the decision would be to let him take the challenge that he said he's up to, or in another way put up or shut up. Call his bluff. I think—I think that's the only way to do it." When asked if that would put the child at risk, Dr. Gambone opined that "visits in a visit hall at South Woods State Prison . . . would not put any child at risk."

Dr. Gambone also testified, "it's recommended that [David] should not currently be considered to present an imminent risk of impulsive harm to himself, his son [Luke] or any other person. However, it is also recommended that [David] should not currently be considered capable of adequately [parenting] any child on an independent basis." Dr. Gambone recommended, "[David] be currently considered appropriate for supervised contact with his son, [Luke], during his incarceration and subsequent release contingent on documented compliance will all court ordered services and Megan's Law supervision."

On cross-examination, Dr. Gambone conceded that David had antisocial personality disorder and "a general disregard for the rights or welfare of others."

A-0030-23

He further agreed that David was "irresponsible now," "untrustworthy," and "unstable," but attributed these traits to his difficult upbringing. Dr. Gambone also noted that the prognosis for treating someone like David—who has antisocial personality disorder—is that "it's not impossible to treat [but] usually not good, meaning that if someone's antisocial . . . it will go on."

Dr. Gambone opined that, "when stable, substance free, conflict free, crime free, symptom free, and stress free [David] may exhibit adequate executive function and learning, problem solving, contingency planning, and social decision making." However, Dr. Gambone indicated that it would take about three months to determine if David could successfully be rehabilitated, and if so, another six months for him to parent Luke. Dr. Gambone noted he did not know Luke and never interviewed him.

David did not testify. The Law Guardian did not present any evidence but joined in the Division's request to terminate David's parental rights to Luke.

III.

Subsequent to the presentation of the evidence and closing arguments of counsel, the judge rendered an oral decision summarizing the matter's procedural history and making factual findings as to each of the required elements of the best-interests-of-the-child standard set forth in N.J.S.A. 30:4C-

15.1(a). Based on those findings, the judge determined the Division sustained its burden of proving by clear and convincing evidence it was in Luke's best interests to terminate David's parental rights.

In his opinion, the judge found Markferding's testimony "very credible," and "clear, concise, and consistent under direct and cross-examination." He found her "recollection of facts was impressive and its accuracy was unrebutted by any evidence in the case," and deemed her "the hallmark of credibility."

The judge also credited Dr. Katz's testimony noting him to be "credible" and "unrefuted in any way by the [d]efense expert's opinion, and honest assessment," and "more dire and pessimistic" than Dr. Gambone.

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see K.H.O., 161 N.J. at 352. The concern is not only with actual harm to the child but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citing N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 616 n.14 (1986)). The focus is not on a single or isolated event, but rather "on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Our Court has explained a parent's withdrawal of nurture and care for an extended period is a harm that endangers the health of a child. D.M.H., 161 N.J. at 379 (citing K.H.O., 161 N.J. at 352-54). When children "languish in foster care" without a permanent home, their parents' "failure to provide a permanent home" may itself constitute harm. Id. at 383 (second quotation citing N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 591-93 (App. Div. 1996)). The judge need not wait until children are "irreparably impaired" by parental abuse or neglect. D.M.H., 161 N.J. at 383. "The State has a parens patriae responsibility to protect children from the probability of serious physical, emotional, or psychological harm resulting from the action or inaction of their parents." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 110 (App. Div. 2004).

Under prong one, the judge found Luke's safety, health, and welfare will be endangered by a continued relationship with David due to his prolonged absence from Luke's life and "[t]he almost complete absence of solicitude, protection, and nurture by [David] has endangered the health and development of [Luke]." The judge further concluded the harm would continue due to David's "psychological and substance misuse." There was substantial credible evidence in the record to support the judge's finding under prong one.

Regarding prong two, which overlaps with prong one, the judge found David has a "true desire" to reunify with Luke but emphasized "the record is clear that he is unable, at this time, to eliminate the harm now or in the foreseeable future." The judge highlighted that the expert testimony and evidence demonstrated that David was unlikely to remedy the harm that his absence caused Luke, and noted that "Dr. Gambone would not downplay the current danger that [David] poses [Luke.]"

The judge concluded David's problem in parenting "has persisted for many years. And there are no indications that any change has taken place for [David] at this time." While Dr. Gambone postulated a course of treatment that would allow David to rehabilitate himself, the judge found it was unlikely to happen in the foreseeable future "especially given the factual finding that there has been no true engagement in services." There is substantial credible evidence in the record to support the judge's finding under prong two.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent,

A-0030-23

developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks omitted) (citation omitted).

Under the first part of prong three, the judge found the Division made reasonable efforts to provide services to David by scheduling substance abuse and psychological evaluations, however, he failed to maintain contact with the Division and vanished. The judge highlighted that the Division searched for David for months but could not provide services in absentia. Therefore, the judge concluded that any lack of services during that period was the result of David's own actions. The judge observed that the Division did not arrange for visitation while David was incarcerated, but found visitation would not be safe at the prison, and therefore there was no prejudice to David.

Under the second part of prong three, the judge found that the Division had explored, without success, alternatives to termination, and assessed numerous relatives and KLG, but all were eventually ruled out. The judge reasoned that the Division initially placed Luke with a relative, but that placement fell through.

Finding Greta well-informed of the difference between KLG and adoption, the judge emphasized Greta "unequivocally" expressed her preference and commitment to adopting Luke. The judge determined that based on Greta's—and Brian's—commitment to adoption, that KLG was not in Luke's best interests. The judge highlighted that the "Division was able to []place [Luke] and his [half-]sister with the same unrelated resource family that took them in during the first removal case." The judge reiterated that the Division assessed the maternal grandfather, the maternal great-grandmother, a paternal aunt, a maternal uncle, and the mother of David's daughter but ruled them out. The record supports the judge's determination under prong three.

Finally, the judge concluded under prong four that the termination of Luke's parental rights would not do more harm than good. The judge found the uncontroverted testimony of both experts demonstrated that David was unable to safely parent Luke now, and Dr. Katz opined that David would not be able to parent in the reasonably foreseeable future. In addition, the judge determined that since Luke's recollection of David was vague due to his incarceration for the majority of the litigation, there would be little to no harm to Luke if David's parental rights were terminated. The judge ultimately concluded that Luke "is

26

in a loving, caring pre-adoptive home," which is "the only time Luke's needs have been met to any degree."

The judge stressed that Luke has waited long enough for a permanent home, and David's "criminal, antisocial lifestyle has resulted in his being absent for most of [Luke's] life." The judge explained that "[Luke] had or has a vague recollection of . . . his father" and didn't know David's name. The judge recounted the "physical and emotional trauma" David suffered while in an orphanage in Russia stating, "[u]nfortunately, he's been unable to overcome that[,]" and "not engaging in any services to try." Further, the resource home is "loving and caring" based on the judge's consideration of the evidence, and Luke is engaging in play therapy and has an Individualized Education Program for his communication impairment. A memorializing order was entered. This appeal followed.

IV.

Before us, David argues the Division failed to prove by clear and convincing evidence all four prongs of the best interests of the child test and that Dr. Katz rendered a net opinion. We are unpersuaded.

27

Prong One

David contends that the judge erred in finding that the Division satisfied the first prong of the "best interest" test by clear and convincing evidence. In particular, David argues because Luke was not harmed by any act that can be attributed to him, this prong of the test has not been sufficiently met to warrant termination of his parental rights.

To satisfy the first prong, the Division must clearly and convincingly demonstrate harm "that threatens the child[ren]'s health and will likely have deleterious effects on the child[ren]." K.H.O., 161 N.J. at 352. This harm need not be actual because "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." D.M.H., 161 N.J. at 383. Rather, courts consider whether the children's safety, health, or development will be endangered in the future. N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001). As such, the prong may be satisfied by the mere risk of harm if supported by sufficient evidence. See D.M.H., 161 N.J. at 383; A.G., 344 N.J. Super. at 435-36.

Our Court has stressed harm includes the denial of "the attention and concern of a caring family" which it considers "the most precious of all resources." D.M.H., 161 N.J. at 379. "A parent's withdrawal of that solicitude,

nurture, and care for an extended period of time is in itself a harm that endangers the health and development of a child." Id. at 379, 383. Such a withdrawal is not "inadequate parenting;" rather, it is a "failure to provide even minimal parenting." Id. at 379 (quoting A.W., 103 N.J. at 606-07). A parent's failure to provide a "permanent, safe, and stable home" engenders significant harm to the children. Id. at 383.

In the matter under review, Judge Wright appropriately concluded that Luke's safety, health or development has been or will continue to be endangered by a parental relationship with David. Pertinently, the judge found that "[David]'s long absence from [Luke]'s life is a clear cognizable harm," and specifically noted that David's "unfortunate own antisocial behaviors" were to blame. The judge reasoned that the "complete absence of solicitude, protection, and nurture by [David]" is ultimately what endangers the health and development of Luke. The record supports that determination.

David maintains that the judge erred because incarceration alone is insufficient to meet the first prong of the statutory test. We are unpersuaded. The record clearly establishes that the judge's decision did not solely rely on David's incarceration, and, in fact, the judge found David's behavior when he was at liberty equally significant. Judge Wright noted that "sadly, even during

the short periods of young [Luke]'s life where his father . . . was at liberty, there's no evidence that [David] exercised parenting time or visitation with [Luke]." Moreover, the judge noted that David "could have availed himself of the legal system to prosecute his right to visit with his son" but failed to do so.

Furthermore, the judge also appropriately found that the danger to Luke would persist into the future due to David's "psychological and substance misuse presentation as discussed by both experts in this case." The judge credited Dr. Katz's testimony that David's psychopathic personality disorder and lack of responsiveness to Luke's needs put the child at risk for a multitude of different types of neglect and abuse if he were placed in David's care. The judge's decision under prong one is amply supported by the credible evidence in the record.

Prong Two

Regarding prong two, David argues the judge erred by speculating about his willingness and ability to eliminate any alleged harm to Luke. The Division and Law Guardian counter that David is not only unable but also unwilling to provide a safe, stable, and permanent home for Luke.

The second prong of the best interest determination, "in many ways, addresses considerations touched on in prong one." N.J. Div. of Youth & Fam.

Servs. v. F.M., 211 N.J. 420, 451 (2012). Evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child[ren]." D.M.H., 161 N.J. at 379. This prong "relates to parental unfitness," K.H.O., 161 N.J. at 352, and "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451.

The Division can satisfy this inquiry by showing the parent or parents cannot provide a safe and stable home and that the child or children will suffer substantially from a lack of stability and permanent placement. M.M., 189 N.J. at 281. Because the Legislature placed "limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child[ren]," "the emphasis has shifted from protracted efforts for reunification with . . . birth parent[s] to an expeditious, permanent placement to promote the child[ren]'s well-being." C.S., 367 N.J. Super. at 111 (citing N.J.S.A. 30:4C-11.1; D.M.H., 161 N.J. at 385; K.H.O., 161 N.J. at 357-59).

Here, the judge concluded the second prong was satisfied. Although the judge found that David had a "true desire" to reunify with Luke, he determined the record clearly established David was "unable, at this time, to eliminate the harm now or in a foreseeable future." Moreover, the judge aptly found

significant that David's own expert witness, Dr. Gambone, did not downplay the current danger that David poses to Luke, and cited Dr. Gambone's testimony that "the problem is [David]'s failure to date to engage with any offered services."

Based upon our review of the record, the judge did not rely upon speculation but rather upon substantial credible evidence in the record in concluding the Division met its burden under prong two. The record supports the determination that David failed to appear for court-ordered substance abuse evaluations and indicated he will never attend sex offender therapy. Therefore, the judge properly found under prong two that David will not rehabilitate himself to a degree necessary to cure the harm he caused Luke.

Under prong two, the judge also correctly found that David is completely unable to provide Luke "with any symbol of a home, much less any stable home," and a delay in permanency would add to the harm, especially in light of the fact the resource parents wish to adopt. The judge's determination under prong two was based upon substantial credible evidence in the record.

<u>Prong Three</u>

David contends the judge erred in concluding that the Division exercised reasonable efforts to provide services to help him to correct the circumstances

that lead to placement outside the home. David also asserts the judge failed to consider alternatives to termination of his parental rights, such as KLG.

KLG allows a relative to become the child's legal guardian and commit to care for the child until adulthood, without terminating parental rights. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004). The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). As such, "when a caregiver . . . unequivocally assert[ed] a desire to adopt," the standard to impose a KLG was not satisfied because the party seeking a KLG arrangement would not be able to show that adoption was neither feasible nor likely. N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011). In other words, when permanency through adoption was available to a child, KLG could not be used as a defense to the termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 341 (App. Div. 2008).

On July 2, 2021, however, the Legislature amended N.J.S.A. 3B:12A-6(d)(3) and removed the statutory requirement that adoption be "neither feasible nor likely," making KLG an equally available permanency plan for children in the Division's custody. However, the Legislature did not delete paragraph (d)(4) of the KLG statute, which requires a court to find "awarding [KLG] is in the child's best interest," N.J.S.A. 3B:12A-6(d)(4), before it can order KLG. Thus, the amended KLG statute simply ensures a resource parent's willingness to adopt and no longer forecloses KLG. But the amendment to N.J.S.A. 3B:12A-6(d)(3) does not affect the trial court's application of the best interests test for parental termination cases as codified under N.J.S.A. 30:4C-15.1(a)(1) to (4).

Substantial credible evidence in this record supports the judge's findings that the Division thoroughly explored alternatives to termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). David's assertion that L. 2021, c. 145 ("2021 amendments") compels KLG is unsupported by the overriding purpose of child protection laws. See N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 27-28 (App. Div. 2022), aff'd, 256 N.J. 4 (2023). The children's best interests are the polestar of any termination decision. D.H., 398 N.J. Super. at 338.

The third prong of the best interests test requires evidence that "the Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks omitted).

"An evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis." D.M.H., 161 N.J. at 390. The evaluating court must also consider "the parent's active participation in the reunification effort." Ibid. In any situation, "[t]he services provided to meet the child's need for permanency and the parent's right to reunification must be 'coordinated' and must have a 'realistic potential' to succeed." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)).

This requires the Division to "encourage, foster and maintain the parent-child bond, promote and assist in visitation, inform the parent of the child's progress in foster care and inform the parent of the appropriate measures [they] should pursue . . . to . . . strengthen their relationship." R.G., 217 N.J. at 557 (alterations in original) (internal quotation marks omitted) (quoting D.M.H., 161 N.J. at 390). What constitutes reasonable efforts varies with the circumstances of each case. D.M.H., 161 N.J. at 390-91.

Here, the record is clear that the Division did not ignore David and expended reasonable efforts to work with him. From the beginning of the guardianship litigation, the Division implemented supervised visitation at the prison between David and Luke, and regularly met with David in person and sent letters to provide status updates of his case. Contrary to David's assertions, the Division did attempt to re-schedule missed visits when Luke was sick. The "inexplicable five-month gap" between visits when David was transferred to a different prison was justifiable because the Division had to evaluate the new prison setting first, and visits were reduced to once a month because the Division had valid concerns about the impact of a six-hour trip on Luke.

We are satisfied the judge's finding that Greta and Brian were advised about KLG, but preferred adoption, is supported by the substantial credible

36

evidence in the record. The 2021 amendments do not make KLG a bar to termination of parental rights followed by adoption because the court must still apply the best interests factors. Moreover, a caregiver must petition a court for a KLG appointment under N.J.S.A. 3B:12A-5(a), which was not done here.

The record shows Greta and Brian clearly rejected KLG because they wanted to give Luke a permanent and stable home. The record shows that when David was at liberty and placed on missing status for failing to maintain contact with the Division, the judge aptly noted "the court can find no fault with the Division's failing to provide services during this period, as it is clearly and convincingly due to [David]'s own actions." In sum, it is clear that the judge's determination rested on Luke's best interests. Moreover, there was no prejudice to David because of the delay because the final clinical recommendation was that visitation was not safe.

Under the second part of prong three, the judge appropriately considered and determined that the record contained unrebutted evidence that the Division initially placed Luke with numerous relatives, but none proved to be permanent. On appeal, David contends the preamble to the 2021 changes to Title 30 and the KLG Act support his argument that the judge did not adequately consider KLG as an alternative and that KLG is the preferred resolution for children who

A-0030-23

cannot return to their parents, and the judge failed to consider the importance of retaining the parent-child relationship between Luke and his father. David also takes issue with the judge's focus on the Division's position that Greta and Brian wish to adopt, which is a consideration he posits to be "no longer determinative in eliminating the alternative to termination of kinship care or KLG."[10]

In the matter under review, Markferding testified about her discussions with the resource parents regarding KLG. The Division clearly investigated KLG alternative options, but the record demonstrates no family members were interested or qualified. It is also undisputed that Ida is in the care of the resource parents. Thus, the judge correctly concluded no KLG opportunities existed.

Prong Four

We are also satisfied with the judge's finding that the termination of David's parental rights under prong four "will not do more harm than good," N.J.S.A. 30:4C-15.1(a)(4), as it is supported by substantial credible evidence. N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App.

---

[10] David also inappropriately cites State v. Gomes, 253 N.J. 6 (2023). This reliance is inappropriate because Gomes dealt with a complete statutory overhaul whereas the KLG amendment made a discrete change. See id. at 35 (cautioning the decision was not "an invitation to disregard statutory language that has been unaltered by new laws").

Div. 2015). The judge acknowledged under prong four, after balancing and considering the relationships between the child and the natural parent and caregivers, the child "will suffer a greater harm from the termination of ties with [their] relationship with the[] foster parent[]," citing N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 181 (2010) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002)).

Here, the judge stressed that both experts testified that David "did not present as being able to parent [Luke] safely now." Moreover, the judge gave great weight to Dr. Katz's testimony that David will not be able to safely parent "in the reasonably foreseeable future" either. The judge found Luke "had or has a vague recollection of his . . . father" because he "stayed six years and [eight] months and spent [thirty-four] months of his life in Division custody with little interaction with his father."

It was well within the judge's discretion to afford significant weight to Markferding and Dr. Katz's testimony. The Division's proofs showed Luke is "in a loving, caring pre-adoptive home" and David is unable to provide the necessary safe and stable home and emotional support Luke needs. See N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 60, 93 (2013); see also

Cnty. of Middlesex v. Clearwater Vill., Inc., 163 N.J. Super. 166, 173-74 (App. Div. 1978).

We are also satisfied by the judge's finding of Luke's need for permanency and stability, and his determination that David would not be able to provide either in the foreseeable future. Moreover, David did not present a viable plan to make the changes necessary to provide Luke with the loving, safe, and stable home he needs and deserves.

V.

Finally, David asserts that Dr. Katz rendered a net opinion because he relied on data that the Division "cherry-picked and sent to him," conducted a short interview of him, did not conduct a bonding evaluation, and never spoke to Luke. Again, we disagree.

Two rules of evidence frame the analysis for determining the admissibility of expert testimony. N.J.R.E. 702 identifies when expert testimony is permissible and requires the experts to be qualified in their respective fields. N.J.R.E. 703 addresses the foundation for expert testimony. Expert opinions must "be grounded in facts or data derived from[:] (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert, which is not necessarily admissible in evidence, but which is the type of

40

data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex (Polzo I), 196 N.J. 569, 583 (2008)).

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo I, 196 N.J. at 583). Therefore, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, L.L.C., 216 N.J. 115, 144 (2013)).

The net opinion rule directs that experts "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In short, the net opinion rule is "a prohibition against speculative testimony." Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

However, "[t]he net opinion rule is not a standard of perfection." Townsend, 221 N.J. at 54. "An expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact

41

which the adversary considers relevant.'" Ibid. (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)). An expert's failure "'to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion.'" Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)).

Generally, the Division's proofs should include testimony by an expert who has had an opportunity to make a "comprehensive, objective, and informed evaluation of the child's relationship with the foster parent," N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 437 (App. Div. 2009) (quoting J.C., 129 N.J. at 19), and the court must also consider "parallel proof of the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child," Id. at 440 (quoting J.C., 129 N.J. at 19). However, where the termination is "not predicated upon bonding, but rather reflect[s] [the child's] need for permanency and [the biological parent's] inability to care for [the child] in the foreseeable future," a lack of a bonding evaluation is not fatal to the Division's case. See B.G.S., 291 N.J. Super. at 593-94.

We observe that while David argues Dr. Katz rendered a net opinion, he fails to point to a single example to support his assertion. David also avers that

42

Dr. Katz did not speak to Luke when his own expert, Dr. Gambone, testified that he could not speak to Luke's best interests as he did not know the child and had not interviewed him. After David's failure to participate in a plethora of services offered by the Division, and the judge's sound finding that Dr. Katz's opinions were fully supported and explained by the overwhelming evidence in the record, David cannot credibly argue Dr. Katz gave a net opinion. Judge Wright did not abuse his discretion in affording great weight to Dr. Katz's opinion.

At bottom, we are satisfied the judge correctly determined the Division presented clear and convincing evidence establishing all four prongs of the best interests of the child standard under N.J.S.A. 30:4C-15.1(a). To the extent we have not specifically addressed any of David's arguments, we conclude they are of insufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

43